# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 8, 2016    Decided February 21, 2017

No. 13-3074

UNITED STATES OF AMERICA,
APPELLEE

v.

CHRISTIAN FERNANDO BORDA, ALSO KNOWN AS TONY,
APPELLANT

———

Consolidated with 13-3101

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cr-00065-1)
(No. 1:07-cr-00065-2)

———

*Elizabeth A. Brandenburg* argued the cause for appellant Borda. With her on the briefs was *Marcia G. Shein*.

*Carmen D. Hernandez*, appointed by the court, argued the cause and filed the briefs for appellant Alvaran-Velez.

*Kirby A. Heller*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee.

2

Before: TATEL and WILKINS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:    Appellants Christian Fernando Borda and Alvaro Alvaran-Velez challenge the outcome of a jury trial finding them guilty under 21 U.S.C. §§ 959, 960, 963 of conspiracy to distribute five kilograms or more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States. In support of their challenge, Appellants allege that the District Court committed numerous procedural errors, including improper evidentiary admissions and exclusions, insufficient jury instructions, *Brady* and *Napue* violations, improper closing arguments, and sentencing errors. Appellants further maintain that there was insufficient evidence to permit a rational juror to find guilt beyond a reasonable doubt. For the following reasons, we affirm Appellants' convictions but remand for the District Court to resentence Mr. Alvaran.[1]

**I.**

On December 9, 2010, Appellants Borda and Alvaran were convicted of conspiracy to distribute at least five kilograms of cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States. At trial, Appellants did not contest that they engaged in drug trafficking, but argued that they lacked the knowledge or intent to import the drugs into the United States. The conspiracy at issue in this case involved three separate transactions: (1) Palm Oil #1; (2) Palm Oil #2; and (3) the El Chino Load. The evidence presented at trial, taken in the light most favorable to

---

[1] Mr. Borda's sentence was not challenged on appeal and, therefore, is not before this Court.

3

the government, *see United States v. Bryant*, 523 F.3d 349, 353 (D.C. Cir. 2008); *United States v. Washington*, 12 F.3d 1128, 1135-36 (D.C. Cir. 1994), is as follows.

## A.

The first Palm Oil deal occurred between January 2005 and May 2005 and involved the transportation of approximately 1,553 kilograms of cocaine hidden in drums of palm oil from Cartagena, Colombia to Puerto Progreso, Mexico. A Mexican drug trafficker named Raul Valladares ("Junior") received the cocaine in Puerto Progreso, a small Mexican port on the eastern side of the country, in mid-2005. Junior transported the cocaine from Puerto Progreso to Monterrey, an inland city located approximately one hour and forty-five minutes (200 kilometers) by car from the United States border. According to the evidence, Monterrey lacked sufficient demand for a load of cocaine as large as the Palm Oil #1 deal. Beginning in August 2005, Junior began working as an informant for the United States Drug Enforcement Administration ("DEA").

In exchange for transporting the cocaine to Monterrey, Junior charged Appellants an 18% fee. The transportation fee was calculated based on the *quantity* of cocaine, not the total price (i.e., Junior received payment in kilograms of cocaine, not money). The usual transportation fee for moving cocaine across the United States border is 40-45%. After selling the cocaine, Junior was responsible for paying Appellants $9,100 per kilogram of cocaine, which is the typical price for cocaine in Monterrey. For cocaine sold in the United States, the usual price increases to $14,000 or $15,000 per kilogram. Appellants expected Junior to pay for the cocaine within ten days of receipt.

4

Junior, however, was unable to reimburse Appellants within the specified time period. In light of this development, Mr. Alvaran met with Camilo Suarez, another confidential informant, on June 15, 2005, to discuss Junior's failure to pay. At this meeting, Mr. Alvaran noted that Junior had started to send "partials" across the border. Despite the successful sale of cocaine, Appellants still had not received payment. Mr. Alvaran commented that Monterrey was full of merchandise (i.e., cocaine), but it was not selling as fast as they had predicted. Junior later explained that he had already begun selling the cocaine at market price and would be able to start delivering money in Monterrey.

Subsequently, on July 20, 2005, Mr. Borda met with Mr. Alvaran and Mr. Suarez to discuss Junior's outstanding payments. Mr. Suarez defended Junior's payment delay by explaining that the "market went bad because the border got harder" for Junior. Appellants then discussed the conditions at the border in greater detail, including new police officers and increased inspections. Mr. Borda admitted that he understood Junior's difficulties because he had previously been a drug dealer in the United States. In particular, Mr. Borda acquired first-hand knowledge of the U.S. drug market while living in New York and Florida, and was previously convicted in the Southern District of Florida for conspiracy to possess with the intent to distribute cocaine back in August 1998. Nonetheless, Mr. Borda expressed frustration at Junior's untimely payments and complained that Junior was not paying the negotiated price. Mr. Borda referred to the fact that Junior had taken the cocaine across the border, sold it at the higher U.S. price, brought the money back to Monterrey, and paid Appellants the Monterrey price for cocaine.

At trial, Mr. Suarez testified that all 1,553 kilograms of the Palm Oil #1 deal were eventually transported into the United

5

States, with at least 200 kilograms trafficked to New York. However, a substantial period of time existed when Mr. Suarez did not know what Junior had done with the cocaine. Additionally, Mr. Suarez noted that Mr. Borda previously refused on two occasions to transport cocaine into the United States because he did not want the "responsibility" or "headache."

By October 2005, Junior had paid Mr. Borda approximately $6 million. Junior's payments were all in United States currency, mostly in $20 bills. However, the testimony at trial established that the money received for the cocaine was laundered through a money exchange house before being distributed to Appellants. Once the proceeds were received in Monterrey, Mr. Alvaran arranged for the cash to be transported to Mexico City. Mr. Alvaran's secretary, Mr. Lucas, would pick the money up in Mexico City and deliver it to Juan Jaime Montoya-Estrada, another co-conspirator. The money was then moved to either Mr. Alvaran's apartment or Mr. Montoya's apartment, where Mauricio Cruz counted the proceeds. The ledgers kept by Appellants and Mr. Montoya show that Junior paid between $153,000 and $1,020,000 every couple of weeks between June 17, 2005 and August 4, 2005.

**B.**

Following the shipment of the first Palm Oil load, but before Junior successfully paid for all of the cocaine, Appellants and Mr. Suarez initiated negotiations for a second Palm Oil deal. The parties discussed shipping additional cocaine from Colombia to Mexico, and Mr. Suarez recommended using Junior on this transaction since the parties had already completed "one run" with him. Although Appellants ordered the palm oil, and Junior invested money in

6

the new deal, the transaction never materialized due to Junior's late payments on the first Palm Oil load.

**C.**

Finally, the third transaction, termed the El Chino Load, occurred in approximately September 2005. In this deal, Appellants and a drug trafficker named El Chino agreed to transport 3,000 kilograms of cocaine from Colombia to Mexico City. The cocaine would be transported in two "go-fast boats," and subsequently transferred to a Venezuelan-registered fishing vessel. The fishing vessel would meet a boat sent by El Chino off the coast of Honduras, and El Chino's associates would then transport the cocaine to Mexico City.

During the initial shipment of cocaine, one of the "go-fast" boats broke down. As a result, only 1,500 kilograms of cocaine made it to the Venezuelan fishing vessel. While the fishing vessel was supposed to meet El Chino's associates approximately sixty miles off the coast of Honduras, the crew spotted a U.S. plane above the vessel and threw the cocaine into the Caribbean Sea before being intercepted by the U.S. Coast Guard. Accordingly, when the Coast Guard searched the vessel, no contraband was discovered.

**D.**

Following the presentation of evidence in this case, the jury returned a guilty verdict for both Mr. Borda and Mr. Alvaran. While the District Court noted that the Government's evidence was "not overwhelming," *United States v. Borda*, 786 F. Supp. 2d 25, 36, 44 (D.D.C. 2011), it upheld the jury's verdict and denied Appellants' request for a new trial.

At the sentencing hearing, the District Court found Appellants responsible for 200 kilograms of cocaine, in

7

accordance with Mr. Suarez's testimony that Junior delivered 200 kilograms of cocaine to New York. The District Court further determined that Mr. Alvaran was "a manager or supervisor" of a conspiracy that included at least five participants. Given this finding, the District Court added three extra points to Mr. Alvaran's offense level, bringing his total level to 41. The Sentencing Guidelines range for this offense level is 324 months to 505 months, and the Probation Office recommended 360 months. The District Court, however, noted that it was not bound by the Guidelines range, and engaged in an analysis of the § 3553 factors. *See* 18 U.S.C. § 3553(a). Following this evaluation, the District Court imposed a below-Guidelines sentence of 180 months for Mr. Alvaran, which was substantially less than Mr. Borda's sentence of 300 months.

After sentencing, Mr. Borda and Mr. Alvaran filed timely appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

Appellants first argue that the Government's evidence at trial was insufficient to permit a rational juror to find that Appellants knew or intended that the cocaine would be transported into the United States. Borda Br. 13, 19-25; Alvaran Br. 6-7, 9-13. In their briefing, however, Appellants ignore the Government's presentation of evidence on the intent element, and erroneously draw all reasonable inferences in favor of themselves. *See* Gov't Br. 18-19; *see generally* Borda Br. 20-25; Alvaran Br. 9-13. For the reasons discussed below, we reject Appellants' sufficiency of the evidence challenge.

## A.

In reviewing a conviction for sufficiency of the evidence, we must determine whether, after viewing the evidence in the

8

light most favorable to the prosecution, *any* rational juror could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Thompson*, 279 F.3d 1043, 1050-51 (D.C. Cir. 2002); *United States v. Washington*, 12 F.3d 1128, 1135-36 (D.C. Cir. 1994). This standard seeks to preserve the jury's role as fact-finder. *Jackson*, 443 U.S. at 319; *United States v. Glover*, 681 F.3d 411, 423 (D.C. Cir. 2012). A defendant "faces a high threshold" and bears a "heavy burden" when seeking to overturn a guilty verdict on this ground. *Washington*, 12 F.3d at 1135; *United States v. Branham*, 97 F.3d 835, 853 (6th Cir. 1996).

**B.**

When viewed in the light most favorable to the Government, the evidence is sufficient to allow a rational juror to find guilt beyond a reasonable doubt. At trial, witness testimony suggested that Appellants knew Junior was sending cocaine across the border. Specifically, Mr. Suarez testified that Junior had started to send "partials" to the border and "[t]hey were waiting for the money to come back from there." Appellants then conversed about Junior's difficulties at the border, and Mr. Borda sympathized with Junior's hardships because Mr. Borda had previously been a drug dealer in the United States. Mr. Suarez further testified that all 1,553 kilograms of the Palm Oil cocaine were transported into the United States, and at least 200 kilograms were sold in New York.

The jury's decision to credit Mr. Suarez's testimony was not unreasonable in light of the circumstantial facts presented by the Government. *First*, the Government introduced evidence regarding the geographic location of Mexico and the United States, focusing particularly on the distance from

9

Monterrey to the U.S. border. Through witness testimony, the Government established that Appellants knew the Palm Oil cocaine would be transported by Junior from Puerto Progreso to Monterrey. Puerto Progreso is a small port, and Monterrey is an inland city with no direct access to the ocean. Although Appellants argued that they intended to sell the cocaine in either Mexico or Europe, a reasonable juror could find that moving the merchandise inland contradicted this theory. Further, Monterrey is located only 200 kilometers from the U.S. border, and the evidence showed that Monterrey had an insufficient demand for the amount of cocaine contained in the Palm Oil load. A rational juror could infer that Appellants did not intend to sell the cocaine in Mexico, but rather intended for the cocaine to be distributed within the United States.

*Second*, Appellants received payment for the Palm Oil cocaine in U.S. currency. At no point in time did Appellants receive payment in European or Mexican currency, refuting Appellants' contentions that they intended to sell the drugs in Europe or Mexico. To the contrary, Appellants kept ledgers that showed the receipt of U.S. currency – mostly in $20 bills. Although the profits passed through a money exchange house before distribution, a reasonable juror could nonetheless infer that the receipt of U.S. currency meant that the drugs were sold in the United States. Thus, Mr. Suarez's testimony, combined with the circumstantial evidence of geographic location and receipt of U.S. currency, could enable a rational juror to find guilt beyond a reasonable doubt.

While Appellants cite numerous examples of evidence they believe to be exculpatory or contradicting, *see* Borda Br. 20-25; Alvaran Br. 9-13, much of that evidence is also consistent with the jury's guilty verdict, and the Court must view all the evidence in a light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319; *Thompson*, 279 F.3d

10

at 1050-51. A reasonable juror could examine the evidence and, taking all inferences in favor of the Government, conclude that Appellants knew or intended that the cocaine would be transported into the United States. Accordingly, Appellants have not met their high burden to show that no rational juror could find for the Government, and the evidence is sufficient to support the jury's guilty verdict.

## III.

Appellants next challenge four specific evidentiary rulings made by the District Court. First, Appellants contend that the District Court erred by denying Mr. Borda's motion to admit a 2006 e-mail from Junior to the DEA. Borda Br. 34-40; Alvaran Br. 17-19. Second, Mr. Borda argues that the admission of his New York property records and Florida driver's license were irrelevant to the case and prejudicial. Borda Br. 40-42. Third, Mr. Borda asserts that the District Court erred by admitting his prior federal drug conviction. *Id.* at 42-48. Fourth, Mr. Borda contends that the District Court erroneously admitted co-conspirator testimony that was unrelated to the charged conspiracy. *Id.* at 48-52. We decline to reach the merits of these arguments because, for the reasons that follow, we find that, even assuming error, any such error was not prejudicial.

## A.

This Court reviews the District Court's evidentiary rulings, particularly the admission or exclusion of evidence, for abuse of discretion. *United States v. Vega*, 826 F.3d 514, 537 (D.C. Cir. 2016) (per curiam); *United States v. Mitchell*, 816 F.3d 865, 870 (D.C. Cir. 2016) (explaining that the trial court's admissibility rulings are reviewed for abuse of discretion if a timely objection is made, and plain error if an objection is not preserved). Even if this Court determines that an evidentiary error occurred, it will not reverse an otherwise valid judgment

11

unless the error affected the appellant's "substantial rights." FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *United States v. Russo*, 104 F.3d 431, 434 (D.C. Cir. 1997); *United States v. Baker*, 693 F.2d 183, 188-89 (D.C. Cir. 1982). An error affects the appellant's substantial rights if it influenced or tainted the outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 734 (1993); *United States v. Smith*, 232 F.3d 236, 243 (D.C. Cir. 2000). As the Supreme Court noted in *Kotteakos v. United States*, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. 750, 765 (1946). Where the Court is sure "that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* Thus, a reversal is usually only warranted where the error was prejudicial. *Olano*, 507 U.S. at 734; *see Baker*, 693 F.2d at 188-89.

**B.**

First, Appellants contend that the District Court erred by denying Mr. Borda's motion to admit a 2006 e-mail from confidential informant Junior to the DEA. *See* Borda Br. 16, 34-40; Alvaran Br. 17-19. Appellants argue that the e-mail, which conveyed Mr. Borda's interest in sending drugs to Europe, was relevant to the issue of intent and did not contain impermissible hearsay. Borda Br. 35-40; Alvaran Br. 17-19. Even assuming that the District Court's decision to exclude this e-mail was error, it was not prejudicial.

**1.**

On March 6, 2006, Junior sent an e-mail to the DEA titled "Tony-Mexico-Saturday 4 March." The e-mail included a

12

description of Junior's meeting with Mr. Borda in which Mr. Borda offered Junior a new deal to settle Junior's account. Most relevantly, the e-mail stated that "[h]e is not interested in sending anything to the United States. Nothing. He is interested in Spain, (Valencia) and Mex." Appellants sought to admit this e-mail to negate the element of intent.

The Government opposed admission of the e-mail and argued that if the District Court admitted Junior's March 6, 2006 e-mail, it would need to admit another e-mail by Junior sent later in the day regarding a meeting with a Mexican drug trafficker named Esteban Olivera (referred to as Estevan). In this second e-mail, Junior explained that he told Estevan "about the business with [Borda]" and that Estevan agreed to receive the containers. The e-mail further reported that "[o]n the trip we receive from [Mr. Borda], he wants to send to New York." The Government argued that the pronoun "he" in the prior sentence referred to Mr. Borda, and suggested Mr. Borda intended to distribute cocaine in the United States.

The District Court was faced with dueling e-mails rather than Junior's testimony because Junior had disappeared by the time of trial and was feared to have been kidnapped and murdered. Ultimately, the District Court declined to admit the March 6, 2006 e-mail. First, the District Court explained that the e-mail did not relate to the charged conspiracy because it occurred six months after the Palm Oil and El Chino deals concluded. Second, the District Court noted that the use of ambiguous pronouns in the e-mail rendered it vague and confusing. Third, the District Court stated that even if the e-mail had been relevant (i.e., within the scope of the conspiracy), it constituted hearsay. Finally, the District Court acknowledged that if Junior's 2006 e-mail were introduced, the Government would be permitted to admit the second e-mail on redirect.

13

**2.**

Without deciding whether the District Court erred, we find that the exclusion of Junior's March 6, 2006 e-mail was not prejudicial. *First*, Junior's 2006 e-mail occurred outside the scope of the conspiracy and was contradicted by another e-mail later that day. It therefore had little probative value on the issue of Mr. Borda's intent to sell drugs in the United States from January 2005 to September 2005. *Second*, Appellants introduced more probative evidence of their intent at trial, rendering Junior's 2006 e-mail duplicative. For example, Mr. Suarez testified on cross-examination that Mr. Borda rejected several offers to send cocaine to the United States. Mr. Suarez further acknowledged that Mr. Borda maintained an interest in transporting cocaine to Europe, particularly Holland, Italy, Spain, Switzerland, and Portugal, and that Mr. Borda had strong connections to ship the cocaine from Mexico to Europe. Accordingly, Junior's March 6, 2006 e-mail stating that Mr. Borda was interested in shipping drugs to Spain and Mexico, not the United States, was cumulative of other evidence presented at trial. Exclusion of this e-mail was not prejudicial.

**C.**

Second, Mr. Borda argues that the District Court erred by admitting his New York property records and Florida driver's license. The District Court deemed this evidence relevant on the issue of intent. As discussed below, we do not find the admission of this evidence to be prejudicial.

**1.**

On August 29, 1994, Mr. Borda and his wife, Martha Borda, purchased property in New York and recorded the deed on September 12, 1994. Land records indicate that Martha Borda has been the owner and occupant of that property since

14

1996. After leaving New York, Mr. Borda obtained a driver's license in Florida on November 13, 1996. Witnesses from the Nassau County Clerk's office in New York and the Florida Department of Highway Safety and Motor Vehicles testified to these facts at trial. Mr. Borda objected to the introduction of this evidence on relevance grounds.

The District Court overruled Mr. Borda's objections and allowed the Government to admit evidence of his U.S. driver's license and property ownership. The District Court found the Government's argument "perfectly reasonable" that by living in the United States Mr. Borda possessed knowledge that the United States is a "major consumer of drugs." Such knowledge could inform the jury of Mr. Borda's intent to distribute drugs in the United States. Moreover, the District Court explained that there was nothing prejudicial about the introduction of this evidence. According to the District Court, the evidence is actually the opposite of prejudicial, in that it "shows a stable person who is buying a home and riding a car legally." The jury should be free to "accept or reject the connections that the government is trying to make and the inferences that the government is asking the jury to accept."

**2.**

We agree with the District Court that Mr. Borda was not prejudiced by the introduction of his property records and driver's license. The evidence merely demonstrates that Mr. Borda legally owned property and obtained a driver's license in the United States for a period of time before his deportation to Colombia. A jury is not likely to leap to the conclusion that Mr. Borda was guilty from the mere mention of his ties to the United States some ten years before the conspiracy, as he argues. Rather, the evidence reflects positively on Mr. Borda, showcasing an individual with a stable livelihood. Further, to

15

the extent the Government used this evidence to show Mr. Borda's knowledge of the U.S. drug market, it was merely duplicative of other testimony and exhibits already in the record. Mr. Borda admitted in tape recorded conversations introduced at trial that he had a prior conviction in the United States for conspiracy to sell drugs, which implies a strong knowledge of the U.S. drug market. Thus, the District Court's admission of Mr. Borda's property records and driver's license cannot be deemed prejudicial.

**D.**

Third, Mr. Borda asserts that the District Court erred by admitting evidence of his 1998 drug trafficking conviction and incarceration with Mr. Montoya. *See* Borda Br. 42-48. In particular, Mr. Borda claims that the prejudicial effect of his prior conviction outweighed its probative value and his conviction had no bearing on his specific intent to distribute narcotics in this case. *Id.* at 44-45. While his prior drug trafficking conviction involved distributing drugs that were already in the United States, the present conspiracy involves importing drugs *into* the United States. *Id.* at 46. Thus, Mr. Borda argues that his prior conviction did not involve a same or similar offense and should not have been presented to the jury. Similarly, Mr. Borda argues that Mr. Montoya should not have been allowed to reference his incarceration with Mr. Borda during his testimony. *Id.* at 17, 47-48. For the reasons discussed below, we find that any error caused by the admission of Mr. Borda's prior drug conviction was not prejudicial.

**1.**

Mr. Borda and Mr. Montoya have prior drug convictions for conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846. The Southern District of New

16

York sentenced Mr. Montoya to 87 months' imprisonment on September 5, 1997, and the Southern District of Florida sentenced Mr. Borda to 70 months' imprisonment on August 4, 1998. Although Mr. Borda and Mr. Montoya were unacquainted at the time of their convictions, they served their sentences together at the Fort Dix Federal Correctional Institution and developed a close friendship.

Following their release from prison, both Mr. Borda and Mr. Montoya were deported to Colombia. Based on their friendship, Mr. Borda hired Mr. Montoya in early 2005 to be his personal representative in Mexico City for drug trafficking. In particular, Mr. Montoya would be responsible for facilitating the transfer of millions of dollars in U.S. currency, which represented drug proceeds, from Mexico to Colombia.

On July 15, 2010, the District Court entered an order prohibiting the Government from introducing the prior convictions of Mr. Montoya and Mr. Borda. The District Court reasoned that the "extreme age of these convictions" and "the fact that the convictions were for significantly different offenses" rendered the evidence irrelevant to the conspiracy charged in this case and improper Rule 404(b) evidence. Alternatively, the District Court explained that the risk of unfair prejudice substantially outweighed the probative value of the convictions under Federal Rule of Evidence 403.

Subsequent to this ruling, Mr. Montoya appeared before the District Court and pled guilty to conspiracy to distribute at least five kilograms of cocaine with the intent and knowledge that the cocaine would be imported into the United States. As part of this plea arrangement, Mr. Montoya agreed to cooperate with the Government and serve as a witness against Appellants. The Government explained that Mr. Montoya would be asked to describe the origin of his relationship with Mr. Borda, which

17

would inevitably reference Mr. Montoya's and Mr. Borda's prior convictions. Such testimony would be necessary to give context to Mr. Montoya's explanations regarding how he became involved in drug trafficking with Mr. Borda. The Government further stated that Mr. Borda himself referenced his prior conviction in several recordings and conversations related to the present conspiracy.

On October 28, 2010, the District Court altered its stance on Mr. Borda's prior conviction and denied Mr. Borda's Motion in Limine to Exclude Reference to Prior Conviction. The District Court found that the Government's evidence was relevant and would not be used for the purpose of establishing Mr. Borda's character or propensity. As such, the evidence would be admissible under Rule 404(b), and its probative value would no longer be outweighed by its prejudicial effect.

At trial, Mr. Montoya testified about meeting Mr. Borda at the Fort Dix Federal Correctional Institution where both men had served sentences for drug trafficking. The Government additionally introduced a certified copy of Mr. Borda's prior conviction. Defense counsel objected both to the witness testimony and documentary evidence of the prior conviction. The District Court overruled the objection.

**2.**

The District Court's admission of testimonial and documentary evidence of Mr. Borda's prior conviction was not prejudicial. The evidence was used to illustrate the closeness of the relationship between Mr. Borda and Mr. Montoya. Admission of this evidence was not prejudicial because (1) Mr. Borda himself admitted in tape-recorded conversations that he had a prior drug conviction, (2) the prior conviction was over a decade old, and (3) the conviction was being used solely to

18

provide context regarding Mr. Montoya's and Mr. Borda's relationship, and was not used to establish propensity.

Further, the District Court adequately instructed the jury regarding the proper and limited use of Mr. Borda's prior conviction, mitigating any prejudice. The District Court told the jury that the evidence was admitted "solely for your consideration in evaluating [Mr. Borda's] intent and knowledge." The District Court articulated that conviction of a past crime "is not evidence" that the defendant is guilty of the offense in this case, and the jury "must not draw any inference of guilt" based on the prior conviction. Under these specific and limited circumstances, the witness testimony and documentary evidence on this issue were thus harmless.

**E.**

Finally, Mr. Borda maintains that the District Court erred by admitting co-conspirator statements regarding transactions outside the scope of the charged conspiracy. *See* Borda Br. 18, 48-52. In particular, Mr. Borda complains about the District Court permitting Mr. Suarez and Mr. Montoya to testify about drug deals or other conversations unrelated to the Palm Oil #1, Palm Oil #2, and El Chino deals. *Id.* at 50. For the reasons that follow, we do not believe that these co-conspirator statements unduly prejudiced Mr. Borda.

**1.**

During the trial, the Government questioned Mr. Suarez and Mr. Montoya about their relationship with Appellants, including how the co-conspirators met. Mr. Suarez stated that he met Mr. Alvaran through a pilot named Tato and that he later learned from Mr. Alvaran that Mr. Borda was "doing a run" with one of Mr. Alvaran's family members, El Rey Zambada. Mr. Suarez then stated that he accompanied Mr. Alvaran to a

19

meeting with Mr. Borda where he was asked to do a run with a plane. No further details were given about this meeting, and Mr. Suarez proceeded to describe the mechanics of recording his conversations with Appellants. The District Court overruled Appellants' objections to Mr. Suarez's testimony on these issues.

Similarly, Mr. Montoya began his testimony by explaining his prior drug trafficking activities in the United States, and describing how he met Mr. Borda while both men were serving prison sentences for prior drug trafficking conspiracies. Mr. Montoya proceeded to explain that his organization was arrested in 1996 for distributing cocaine, and that the authorities discovered the group after they arrested a Mexican national in Houston with 400 kilograms of cocaine and allowed him to travel to New York. Mr. Montoya explained that "Jorge Lamos and all of the others in the group" provided him with this information. The District Court provisionally overruled Appellants' objection to this testimony "subject to the government's tying it up appropriately." The parties, however, never revisited this testimony. Gov't Br. 48.

**2.**

Mr. Borda argues that these statements by Mr. Suarez and Mr. Montoya constitute impermissible hearsay that occurred outside the scope of the conspiracy and should have been excluded from the trial. Borda Br. 49-52. Regardless of whether the District Court erred by permitting these statements, we find that the admission of this testimony was not prejudicial. Mr. Suarez's and Mr. Montoya's testimony did not directly implicate Mr. Borda in criminal activity, and was very brief. Mr. Montoya later clarified that he did not even meet Mr. Borda until his prison term began at the Fort Dix Federal Correctional Institution. Thus, regardless of whether the

20

testimony related to the charged conspiracy, it did not affect Mr. Borda's substantial rights.

## IV.

Appellants next argue that the District Court erred during closing argument. *See id.* at 59-60; Alvaran Br. 20-35. In particular, Appellants advance two contentions. First, Appellants maintain that the Government misstated evidence about the transportation fees associated with moving the cocaine, mischaracterized the identity of the money exchange house, and improperly analogized the case to bees flying over the U.S. border. Second, Mr. Alvaran argues that the District Court erred by precluding him from calling into question the sufficiency of the Government's evidence during his closing remarks. *See* Alvaran Br. 25-35. This purported error, Mr. Alvaran contends, prevented the closing arguments from being "well balanced." *Id.* at 32. As explained below, we do not believe the District Court abused its discretion on either issue.

## A.

We first address Appellants' contention that a new trial was warranted due to prosecutorial misstatements during closing argument.

## 1.

This Court reviews improper prosecutorial statements for "substantial prejudice," and reviews the District Court's denial of a motion for new trial based on this objection for abuse of discretion. *United States v. Straker*, 800 F.3d 570, 628 (D.C. Cir. 2015) (per curiam); *United States v. Alexander*, 331 F.3d 116, 128-29 (D.C. Cir. 2003). While it is error for counsel to rely on any evidence not introduced during the trial, *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998), a

21

prosecutor's statements in closing argument "will rarely warrant a new trial," *United States v. Watson*, 171 F.3d 695, 699 (D.C. Cir. 1999). The question this Court must ask is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The prosecutorial misconduct must have affected the jury's ability to view the evidence fairly. *United States v. Thomas*, 114 F.3d 228, 246 (D.C. Cir. 1997). To determine the prejudicial effect of a closing argument error, this Court examines three factors: (1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the error; and (3) the closeness of the case. *Watson*, 171 F.3d at 700; *see United States v. Moore*, 651 F.3d 30, 50 (D.C. Cir. 2011) (per curiam).

**2.**

At the conclusion of the trial, the Government presented closing arguments that involved two alleged misstatements of evidence and an inapt metaphor. First, the Government erroneously summarized Mr. Suarez's testimony regarding the transportation fee Junior received for the Palm Oil #1 deal. During trial, the parties presented evidence that Junior only charged Mr. Borda an 18% transportation fee to move the cocaine from Puerto Progreso to Monterrey. In its closing argument, however, the Government erroneously summarized Mr. Suarez's testimony regarding how the transportation fee was calculated. While Mr. Suarez's testimony was that the transportation fee was based on drug *quantity*, the Government alleged that the fee was calculated based on the total *price*. Defense counsel objected to this characterization.

Second, the Government argued in summation that Appellants received payment for the Palm Oil cocaine in U.S.

22

currency. Mr. Montoya testified at trial that Mr. Alvaran arranged to transport the proceeds of the transaction in armored trucks from Monterrey to a currency exchange house in Mexico City. In its closing argument, the Government erroneously described the money exchange house as "an armored car company." Mr. Alvaran further maintains that the Government failed to identify the currency as U.S. dollars until the proceeds passed through the money exchange house. *See* Alvaran Br. 21. As a result, Mr. Alvaran claims that the fact that the proceeds "passed through a money exchange house negated any logical inference that it had originated as dollars." *Id.* at 21.

Finally, the Government analogized transportation of the cocaine into the United States to bees flying across the U.S.-Mexico border. Specifically, the Government argued that if Appellants had opened a box of bees at the U.S. border and instructed the bees not to fly north, some of the bees would inevitably disobey instructions and cross the border. Similarly, by transporting cocaine close to the border, Appellants knew that some of the cocaine would be imported into the United States. Appellants objected to the metaphor, arguing that cocaine lacks the ability to self-locomote.

Despite the alleged errors, the District Court denied Appellants' request for a new trial. The District Court found that while the Government misstated evidence relating to the transportation fees and money exchange house, these errors did not impact the jury's ability to judge the evidence fairly. Although the transportation fee was a central issue in the case, the jury heard "a great deal of evidence" on this topic, and had a substantial opportunity to judge the accuracy of the evidence. It is unlikely that the jury would disregard its own recollection of the evidence for a brief misstatement in the Government's closing argument. Regarding the money exchange house, the

23

District Court noted that the identity of this institution was a minor point that had no bearing on Appellants' intent.

**3.**

The Government's alleged closing argument errors did not prejudice Appellants. As a result, the District Court did not abuse its discretion by denying the motion for new trial on this ground.

*First*, as the District Court explained, the case was close but the jury heard substantial evidence on the issue of the transportation fees, which was largely uncontested. As the Government pointed out in its brief, Gov't Br. 72-73, the prosecutor's misstatement did not materially misrepresent the evidence because the evidence showed that Mr. Borda made roughly the same profit whether Junior purchased the cocaine from him at the Monterrey price or at the Houston price, which was the point of the closing argument. Although the Government's calculation was not entirely accurate, neither Appellant disputed this point in his reply brief. Moreover, the Government's position remains consistent with its theory of the case, namely that the Appellants accepted lower prices in exchange for avoiding responsibility for importing the cocaine into the United States. Thus, the misstatement was ultimately not prejudicial.

*Second*, the Government's mischaracterization of the money exchange house was not prejudicial. The identity of the money exchange house was not central to the trial. The Government did not deny or misrepresent that Appellants laundered the money through an exchange house; rather, the Government erred only in its brief description of the money exchange house as an armored car company instead of saying that the armored car company transported the money to the

24

exchange house. This misstatement did not weigh on the issue of Appellants' intent, and thus, was not prejudicial.

*Third*, the Government's metaphor comparing cocaine trafficking to bees does not amount to reversible error. Many decades ago, the Eighth Circuit explained that when closing arguments do not go beyond the evidence in the case, "the trial court is not required to judge with too great nicety the appropriateness of the comparisons, metaphors, and other figures of speech with which they may seek to point the argument or adorn the peroration." *Green v. United States*, 266 F. 779, 784 (8th Cir. 1920). The Ninth Circuit recently espoused similar reasoning, stating that the protections afforded to defendants under the due process clause do "not mean that every jarring or badly selected metaphor renders a trial fundamentally unfair." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1151-52 (9th Cir. 2012).

For instance, the Seventh Circuit held that the prosecution's use of a metaphor comparing the growth of a conspiracy to that of cancer was appropriate. *United States v. Caliendo*, 910 F.2d 429, 436-37 (7th Cir. 1990). The Fourth Circuit similarly upheld the prosecution's use of a metaphor in which the defendant hypothetically played a role in unknowingly funding a terrorist act. *United States v. Baptiste*, 596 F.3d 214, 226 (4th Cir. 2010). The prosecution's purpose in posing this hypothetical was to provide the jurors with an example of unforeseeable criminal activity so that they could determine that the defendant's distribution of drugs was in fact foreseeable. *Id.* at 227. Additionally, the metaphor constituted only a minor part of the closing argument – approximately fourteen lines in a thirty-six page transcript. *Id.* Thus, the metaphor did not prejudice the defendant. *See also United States v. Ross*, 703 F.3d 856, 879 (6th Cir. 2012) (holding that

25

the prosecutor's use of a metaphor to summarize his case theory was appropriate).

Here, the Government's use of the bees metaphor did not prejudice Appellants. The Government used the metaphor to show that Appellants could not have been blind to the fact that the cocaine would be transported into the United States, just as a reasonable person would not have believed that bees released near the border would obey an instruction not to travel north. Appellants are correct that bees self-locomote while cocaine does not, but the metaphor is not so inapt as to raise due process concerns. Further, as in *Baptiste*, the use of the bees metaphor constituted only a small part of the Government's closing argument. It is unlikely that the jury would have been unduly influenced by this metaphor, which comprised a small portion of a lengthy closing argument. Therefore, the Government's metaphor is not reversible error.

**B.**

Mr. Alvaran additionally contends that the District Court erred by precluding him from calling into question the sufficiency of the Government's evidence during his closing remarks. Alvaran Br. 25-35. This characterization of the District Court's ruling, however, is inaccurate. The District Court properly sustained the Government's objection when Mr. Alvaran tried to reference material that was *outside* the record. Thus, the District Court did not abuse its broad discretion by limiting Mr. Alvaran's closing argument to the evidence presented at trial.

**1.**

The District Court's decision to limit the scope of closing argument is reviewed for abuse of discretion. *See United States v. Stubblefield*, 643 F.3d 291, 295 (D.C. Cir. 2011); *United*

26

*States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992) (per curiam). Abuse of discretion will only be found where the District Court's ruling prevented defense counsel from making an essential point. *Hoffman*, 964 F.2d at 24. Defense counsel "must be permitted to argue all reasonable inferences from the facts in the record," including negative inferences that arise when a party fails to call an important witness or introduce relevant evidence "and it is shown that the party has some special ability to produce such witness or other evidence." *Id.* Counsel may not, however, premise an argument on evidence that has not been admitted. *Id.*; *Johnson v. United States*, 347 F.2d 803, 805 (D.C. Cir. 1965).

**2.**

During Mr. Alvaran's closing argument, defense counsel asked the jury to speculate about the questions the DEA must have asked Junior after his arrest in Houston. The Government objected, and the District Court sustained the objection. At a sidebar, defense counsel explained that the jury would be asked "to infer from the evidence that is in, which is that DEA agents debrief informants, that they would have asked Junior about what he had shipped, and if he had given them a name, an address, a time, they could have investigated." The Government argued that any debriefing of Junior where he told the DEA agents about the Palm Oil load would have been hearsay and inadmissible if the Government had tried to introduce that evidence. According to the Government, Mr. Alvaran "cannot stand here and tell the jury that the government did not bring in inadmissible evidence." Additionally, the Government stated that Mr. Alvaran should not be permitted to argue hearsay that is not in the record. The District Court agreed and noted that "[t]here is nothing to support [Mr. Alvaran's argument] in the evidence."

27

**3.**

We agree with the District Court that the record did not support Mr. Alvaran's closing argument. Accordingly, the District Court did not abuse its discretion by limiting Mr. Alvaran's closing argument to evidence contained in the record. While the record established that Junior cooperated with the DEA, Mr. Alvaran requested that the jury infer that Junior did not provide inculpatory information to the DEA because the Government would have introduced that evidence at trial. Gov't Br. 77. Mr. Alvaran takes this argument a step too far.

In *Hoffman*, this Court found it permissible for defense counsel to argue at closing that the Government failed to introduce any fingerprint evidence. *Hoffman*, 964 F.2d at 24. The Government conceded that the absence of such evidence constitutes a relevant "fact" that can be argued before the jury. *Id.* The defense counsel in *Hoffman*, however, "attempted to go far beyond merely pointing out the lack of fingerprint evidence and arguing that its absence weakened the Government's case." *Id.* Defense counsel instead argued that the lack of fingerprint evidence meant that the police did not try to obtain fingerprint evidence from the plastic bags containing the narcotics, that this violated police procedures, and that if fingerprint evidence had been obtained, it would have been favorable to the defense. *Id.* at 24-25. This Court concluded that the defense attorney "moved from arguing fair inferences from the record to arguing the existence of facts *not* in the record." *Id.* at 25. Thus, this Court held that the District Court did not err or abuse its discretion by precluding these arguments during closing. *Id.*

Similar to *Hoffman*, Mr. Alvaran exceeded the permissible bounds of using negative inferences. At closing, Mr. Alvaran was permitted to argue that the Government failed to introduce

28

any evidence that drugs had been seized in the United States. Gov't Br. 78. This was a logical inference from the record. However, Mr. Alvaran's additional argument – i.e., that because the Government did not produce the cocaine, Junior must not have been able to tell the Government how the cocaine was sold in the United States – was an improper expansion of the record. Further, Mr. Alvaran's contention that the closing argument phase "was not well balanced" because of this restriction misses the mark. *See* Alvaran Br. 32-35. The arguments made by the Government were logical extensions of the evidence contained in the record, unlike Mr. Alvaran's statements. *See* Gov't Br. 79-81. Therefore, the District Court did not abuse its discretion.

**V.**

The next theory Mr. Borda advances is that the District Court failed to properly identify for the jury which portion of the testimony and exhibits were being struck from the record. *See* Borda Br. 52-57. Although the District Court instructed the jury to remove specific exhibits from their evidence packet and to disregard any testimony associated with those exhibits, the District Court did not specifically identify the content of the dialogue being struck. Mr. Borda maintains that this constitutes reversible error because the District Court's decision to strike this information occurred approximately one to two weeks after the evidence was introduced. We hold that the District Court did not abuse its discretion.

**A.**

This Court reviews the denial of a requested jury instruction *de novo*. *United States v. Kayode*, 254 F.3d 204, 214 (D.C. Cir. 2001). The Court, however, defers to the District Court's choice of language in the jury instructions unless it constitutes an abuse of discretion. *United States v. White*, 116

29

F.3d 903, 924 (D.C. Cir. 1997) (per curiam). When evaluating an alleged error in jury instructions, the Court examines the charges as a whole and must determine whether "there was a likelihood of misleading the jury to the extent that it is more probable than not that an improper verdict was rendered." *United States v. Thurman*, 417 F.2d 752, 753 (D.C. Cir. 1969) (per curiam). "An error in a jury instruction does not require reversal if the error was harmless." *United States v. Cicero*, 22 F.3d 1156, 1161 (D.C. Cir. 1994).

**B.**

The evidence of the conspiracy introduced at trial extended from January 2005 to September 2005, and included the Palm Oil #1 deal, Palm Oil #2 deal, and El Chino load. At one point during the trial, the Government referenced a side deal with Mr. Alvaran's nephew. Specifically, Mr. Suarez testified that he conversed with Mr. Alvaran regarding a drug deal that would take place in Juarez, Mexico, which is located on the border of the United States. The English translation of this conversation was provided to the jury as Government Exhibit 35B. Appellants objected to this testimony as outside the scope of the conspiracy. *See* Borda Br. 52. Additionally, Mr. Borda further argued that the conversation did not involve him, but rather referenced a side deal between Mr. Alvaran and Mr. Suarez. *See id.* at 52-53. The District Court overruled the objections and conditionally allowed the Government to present this evidence subject to appropriately tying it up later.

Further, the District Court permitted the Government to introduce Exhibit 77B, which comprised four clips from conversations Mr. Suarez had with Chivo, Junior's assistant. Mr. Borda was present during these conversations, but was on the phone with another individual for part of the time. *See id.* at 53. The conversations concerned Chivo's transportation of

30

money through an account in Florida, and Mr. Borda's interest in moving cocaine to Juarez and Atlanta. On redirect, Mr. Suarez testified that he had a conversation with Mr. Borda on this subject, and a recording of this conversation was played for the jury. *Id.*

At the end of the Government's evidentiary presentation – which was approximately two weeks after the admission of Government Exhibit 35B, and one week after the admission of Government Exhibit 77B – the District Court reviewed all of the co-conspirator statements. *See id.* at 54. The District Court found that Mr. Suarez's statements regarding Juarez, Florida, and Atlanta were not made in furtherance of the charged conspiracy. Rather, a substantial period of time had passed between the Palm Oil #1 deal and the conversation with Chivo. Accordingly, the statements were inadmissible hearsay and not properly connected to the present charges. The District Court, therefore, struck the testimony and corresponding exhibits.

In striking the exhibits, the District Court instructed the jury as follows: "Those exhibits have been struck from the record and I'd like to take a minute or two for you to find them in your folders and I'll take them back from you. It's 35 A and B, clips 5 and 6." Defense counsel then requested that the District Court further instruct the jury that the actual testimony regarding those exhibits be stricken as well. While the District Court initially declined this request, saying that the jury would not understand the difference, it nonetheless provided a brief explanation to the jury: "Ladies and gentlemen, I'm sure you all understand. The testimony, the actual testimony in court regarding those particular exhibits and clips, that testimony is struck from the record as well." The District Court noted that its decision to strike this evidence would only require "one paragraph or so" to come out. The District Court denied Appellants' request to specify exactly what content was being

31

struck – i.e., to refer directly to Juarez, Florida, and Atlanta. Additionally, at the end of the trial, the District Court instructed the jury to disregard questions, answers, and exhibits that were stricken from the record. Mr. Borda maintains that the two-week delay in striking this evidence, along with the District Court's failure to tell the jury exactly what portions of the testimony were to be disregarded, was error.

## C.

Mr. Borda's argument on this issue is a nonstarter. As a preliminary matter, Mr. Borda cannot point to any case law – and we have been unable to identify any precedent – that requires the District Court to provide a detailed explanation and summary of all testimony and exhibits being struck from the record. The District Court instructed the jury as to which exhibits should be removed, and informed the jury that the oral testimony concerning those exhibits was also struck from the record. The jurors physically removed the offending exhibits from their packets, and were unable to view those exhibits during deliberations. Nothing mandates a more specific jury instruction whereby the judge must identify the exact content of the testimony being struck.

Moreover, it would not have been feasible or realistic for the District Court to accurately summarize the testimony being struck from the record because the evidence was confusing and references in the struck conversations were unclear. When requesting a more specific instruction, defense counsel even conceded that he had no idea how a more specific instruction would be done. For these reasons we decline to find prejudice or an abuse of discretion.

32

## VI.

The next argument raised by Appellants is that the Government violated its obligation to produce exculpatory documents under *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Borda Br. 26-31; Alvaran Br. 13-16. In particular, Appellants identify two instances of alleged *Brady* violations. First, Appellants argue that the Government delayed disclosing DEA reports in which Junior specified Mr. Borda's interest in transporting drugs to Europe and Canada. *See* Borda Br. 31-34. For purposes of this appeal, Appellants have concentrated their argument on a 2005 e-mail written by Junior to the DEA. This e-mail was disclosed before trial. Second, Appellants maintain that the Government withheld a draft report by DEA agent Patricia Skidmore, in which Ms. Skidmore documented an interview she conducted with Junior in January 2006. *See id.* at 28; Alvaran Br. 13-15. The District Court examined these allegations and concluded that no *Brady* violations occurred. As a result, the District Court denied Appellants' request for a new trial on this basis. We agree with the District Court that the Government did not violate *Brady*.

## A.

Generally, this Court reviews the District Court's refusal to grant a new trial for abuse of discretion; however, *Brady* claims "present something of a special situation." *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007). On appeal, whether the Government has breached its obligations under *Brady* is a question of law that is reviewed *de novo*. *United States v. Emor*, 573 F.3d 778, 782 (D.C. Cir. 2009); *United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008). Thus, the issue is not whether the District Court properly exercised its discretion by refusing to order a new trial, but whether the District Court properly determined whether a *Brady* violation

existed. *Oruche*, 484 F.3d at 596. Once a *Brady* violation is established, a new trial is the prescribed remedy and is not subject to discretion. *Id.* at 595.

**B.**

The Supreme Court has imposed upon the prosecution an affirmative duty to disclose exculpatory evidence to the defense, even if no request has been made by the accused. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady*, 373 U.S. at 87. To prove a *Brady* violation, the movant must demonstrate three elements. First, the movant must show that the evidence at issue is favorable to the accused, either as impeachment or exculpatory evidence. *Strickler*, 527 U.S. at 281-82; *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985). Second, the movant must prove that the evidence was suppressed by the State, either willfully or inadvertently. *Strickler*, 527 U.S. at 281-82.

Third, the movant must demonstrate prejudice. *Id.* To satisfy the prejudice element, the evidence must be material. *United States v. Brodie*, 524 F.3d 259, 268 (D.C. Cir. 2008); *United States v. Bowie*, 198 F.3d 905, 908 (D.C. Cir. 1999). Evidence is "material" if there is a "reasonable probability" that the result of the trial would have been different had the evidence been admitted and used appropriately. *Kyles*, 514 U.S. at 433-34; *Bagley*, 473 U.S. at 676; *Bowie*, 198 F.3d at 908. The term "reasonable probability" means that the chances of reversal must be high enough to "undermine confidence in the outcome" of the trial. *Bowie*, 198 F.3d at 908; *see United States v. Bailey*, 622 F.3d 1, 8 (D.C. Cir. 2010). When examining reasonable probability, the Court must not view the evidence in isolation, but rather must consider the non-disclosure "dynamically" and take into account the numerous predictable impacts the evidence could have on trial strategy.

34

*United States v. Pettiford*, 627 F.3d 1223, 1229 (D.C. Cir. 2010); *Johnson*, 519 F.3d at 489; *Bowie*, 198 F.3d at 912. Cumulative evidence is not considered material as long as it is "the same kind of evidence" as that introduced at trial. *Brodie*, 524 F.3d at 269; *see Emor*, 573 F.3d at 782. Thus, the movant's burden is to demonstrate a reasonable probability of a different trial result. *Strickler*, 527 U.S. at 291.

## C.

Appellants first maintain that the Government violated *Brady* by delaying its disclosure of a 2005 e-mail from Junior stating that Mr. Borda was interested in sending drugs to Europe and Canada. As an initial matter, this evidence was disclosed before the trial. A new trial will rarely be warranted based on a *Brady* claim where the defendant obtains the information in time to use it at the trial. *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008). Where evidence is disclosed late but before trial, the defendant must show a reasonable probability that an earlier disclosure would have altered the trial's result. *Id.* Here, Appellants have failed to demonstrate prejudice, which is the cornerstone of *Brady*.

## 1.

From August 2005 until his kidnapping and suspected death in March 2006, Junior worked as an informant for the DEA. Throughout the course of this relationship, Junior identified suspected drug trafficking operations. In September 2005, Junior disclosed that Mr. Borda "is discussing a new route from Colombia to Europe and Canada."

On October 18, 2010, before commencement of the trial in early November, the Government disclosed redacted versions of DEA-6 forms and summaries of Junior's debriefings by DEA special agents between August 2005 and March 2006.

35

Junior's September 2005 e-mail was identified as part of this discovery. On October 19, 2010, Mr. Borda filed a motion for disclosure of *Brady* evidence, arguing that the Government withheld material exculpatory evidence (including the September 2005 e-mail) until a few days before trial. The District Court denied Mr. Borda's motion and concluded "that evidence pertaining to Defendant Borda's involvement in selling drugs to other countries outside of the United States is not Brady evidence." Appellants contest this ruling and argue that Junior's e-mail constituted admissible *Brady* evidence.

**2.**

Appellants' *Brady* argument is unpersuasive, as it fails to demonstrate materiality or prejudice. Even assuming that Junior's 2005 e-mail contained exculpatory evidence and that the Government inadvertently suppressed this evidence, Appellants were not prejudiced. Appellants received this e-mail in time to use it at trial, and they introduced other evidence that showcased Mr. Borda's interest in selling cocaine in Europe. Appellants make no claim that an earlier disclosure would have altered the result at trial. Rather, the jury heard similar evidence at trial and nonetheless found Appellants guilty. Thus, the Government's delay in producing the e-mail did not prejudice Appellants. Accordingly, a *Brady* claim is not viable.

**D.**

Appellants next contend that the Government's failure to reveal a draft report written by Ms. Skidmore during an interview with Junior constitutes a *Brady* violation. *See* Borda Br. 26-31; Alvaran Br. 13-15. Similar to the prior *Brady* claim, Appellants' argument fails because they cannot demonstrate prejudice.

36

**1.**

After the jury returned a verdict, Appellants alleged that the Government withheld exculpatory evidence demonstrating that they did not know or intend for the Palm Oil cocaine to be transported to the United States. Appellants made this allegation based on a written statement by Raphael Mejia, who was incarcerated with Mr. Borda and co-conspirator H.B. at Northern Neck Regional Jail in Warsaw, Virginia. Mr. Mejia alleged that H.B. informed him that Mr. Borda "made it very clear to him (H.B.) and [Junior] that he (Borda) did not want any cocaine sent to the United States."

The District Court found that Appellants had raised a "colorable claim" and required the Government to disclose all DEA reports and rough notes relating to H.B. and Junior. Following the Government's disclosures, Appellants raised nine additional *Brady* claims, including an allegation that the Government failed to disclose a draft report by Ms. Skidmore of a January 2006 interview with Junior. According to the report, Junior mentioned that Mr. Borda "advanced" 100 kilograms of cocaine to Junior and H.B. individually, and that "[u]nbeknownst to Borda," several co-conspirators, including Junior, "took an additional 100 kilograms of cocaine believing they could sell it in Houston for a larger profit."

In light of this evidence, the District Court convened a post-trial hearing at which Ms. Skidmore testified. Ms. Skidmore explained that her notes regarding this conversation with Junior were only in draft form and had never been finalized due to Junior's disappearance. When questioned regarding what facts were "unbeknownst" to Mr. Borda, Ms. Skidmore explained that Mr. Borda was unaware that Junior and H.B. had each taken an extra 100 kilograms of cocaine to sell in Houston. Mr. Borda was not necessarily unaware that the original 200

kilograms of cocaine were to be sold in the United States. Ms. Skidmore further testified that Junior never indicated to her or any other agent that Mr. Borda did not know the cocaine was going to the United States. Following the evidentiary hearing, the District Court denied Appellants' motion for a new trial. *See United States v. Borda*, 941 F. Supp. 2d 16 (D.D.C. 2013). Specifically, the District Court found that Ms. Skidmore's testimony "directly contradicts Defendants' interpretation of the draft report she wrote."

**2.**

Similar to the first *Brady* allegation, Appellants have failed to show that the exclusion of the DEA report was prejudicial. To satisfy the prejudice prong, Appellants were required to show a reasonable probability that the result of the trial would have been different if the evidence had been admitted. *Kyles*, 514 U.S. at 433-34; *Bagley*, 473 U.S. at 676. No such showing of prejudice has been made in this case. If the District Court had admitted Ms. Skidmore's draft report, it is extremely likely that Ms. Skidmore would have given the same testimony she provided at the post-trial hearing. This testimony would have clarified Junior's statements in a manner at odds with Appellants' interpretation. *See* Gov't Br. 66-67. In any event, the report says nothing about the disposition of the remaining cocaine from the Palm Oil load, including the 200 kilograms Junior testified he brought to New York. *See id.* at 65-66. Thus, it is not reasonably probable that the jury would have arrived at a judgment of acquittal based on this evidence. As such, Appellants have failed to establish a *Brady* violation.

Appellants, however, argue that admission of Ms. Skidmore's report would have altered their cross-examination techniques and trial strategy, particularly with regard to the amount of cocaine trafficked into the United States. *See* Oral

38

Arg. at 15:00-16:00, 16:45-17:25, United States v. Borda (Nov. 8, 2016) (13-3074). This argument is unpersuasive. Mr. Suarez testified at trial that at least 200 kilograms of cocaine from the Palm Oil load were transported into the United States. Thus, Ms. Skidmore's report did not introduce any new or different information regarding the volume of cocaine trafficked into the United States. Appellants possessed notice of these facts before trial, and were not prejudiced by the exclusion of this report.

## VII.

Mr. Alvaran separately argues that in addition to the second *Brady* violation discussed in Part VI, the Government violated *Napue v. Illinois*, 360 U.S. 264 (1959) by failing to alert the District Court to Mr. Suarez's false testimony. *See* Alvaran Br. 16. Specifically, Mr. Alvaran claims that Mr. Suarez's testimony about the Palm Oil cocaine being shipped to the United States was false because Junior told the Government that it was "unbeknownst" to Mr. Borda that the cocaine was transported across the border. *Id.* Mr. Alvaran's argument, however, misses the mark. The touchstone of a *Napue* violation is that the testimony must be *false*. *Napue*, 360 U.S. at 269. Ms. Skidmore clarified in her post-trial hearing that what was "unbeknownst" to Mr. Borda was that Junior and H.B. took *additional* cocaine to sell in the United States; not that the original 200 kilograms of cocaine would be sold in New York. Therefore, Mr. Suarez's testimony about the Palm Oil cocaine being shipped to the United States does not directly contradict Ms. Skidmore's report. While the 200 kilograms of cocaine described by Mr. Suarez may not be the same 200 kilograms of cocaine identified by Ms. Skidmore, nothing in Ms. Skidmore's report or her testimony gives rise to an inference that Mr. Suarez lied on the stand. Thus, this claim is without merit.

39

## VIII.

Mr. Alvaran's final argument is that the District Court erred during the sentencing phase. In particular, Mr. Alvaran argues that the District Court improperly calculated the quantity of cocaine for which he was responsible and thus, erroneously applied a three-level sentencing enhancement. Alvaran Br. 35-43. Mr. Alvaran additionally suggests that the District Court did not consider mitigating circumstances and that the case should be remanded for resentencing because he will be older than Mr. Borda upon his release from prison. *Id.* at 43-45. For the reasons that follow, we reject Mr. Alvaran's contentions of error but remand for resentencing in light of the retroactive amendment to the cocaine sentencing guidelines. *See generally* 18 U.S.C. § 3582(c)(2); U.S. Sentencing Guidelines Manual § 1B1.10 App'x C Supplement, Amendment 782 (Nov. 1, 2014) [hereinafter Amendment 782].

## A.

This Court reviews the District Court's factual findings during the sentencing hearing for clear error. *United States v. Foster*, 19 F.3d 1452, 1455 (D.C. Cir. 1994). The District Court's inferences from the facts are accorded the same deferential standard of review as the actual findings. *Id.* Pursuant to the clear error standard, this Court will affirm the District Court's decision unless it has a "definite and firm conviction that a mistake has been committed." *United States v. Brockenborrugh*, 575 F.3d 726, 738 (D.C. Cir. 2009) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The Court further gives "due deference" to a District Court's application of the Sentencing Guidelines to the facts. *United States v. Henry*, 557 F.3d 642, 645 (D.C. Cir. 2009).

40

**B.**

During the sentencing hearing, the District Court found Mr. Alvaran responsible for 200 kilograms of cocaine, in accordance with Mr. Suarez's testimony that Junior delivered 200 kilograms of cocaine to New York. The District Court deemed this amount reasonably foreseeable to both Mr. Alvaran and Mr. Borda "given the scope of the agreement or the conspiracy into which they had all entered." The District Court further found that "there is absolutely no question that Mr. Alvaran was neither a minimal nor a minor participant" in the conspiracy. Rather, "he was indeed a manager or supervisor." In support of this finding, the District Court elaborated on the following facts: (1) Mr. Alvaran introduced Mr. Suarez to Mr. Borda; (2) Mr. Alvaran went to Monterrey with Junior to make sure that the cocaine had arrived; (3) Mr. Alvaran arranged for the drug proceeds to be transported to a money exchange house in Mexico City; (4) Mr. Alvaran directed Mr. Lucas to bring drug proceeds to Mr. Alvaran's apartment for safekeeping; and (5) Junior called Mr. Alvaran once the cocaine arrived in Puerto Progreso for permission to move the cocaine to Monterrey. Thus, the District Court could properly infer that Mr. Alvaran was aware that 200 kilograms of cocaine would be sent to New York.

Further, the District Court concluded that Mr. Alvaran "supervised" his secretary, Mr. Lucas, and that the conspiracy involved at least five people: Mr. Borda, Junior, Mr. Montoya, Mr. Cruz, and Mr. Lucas. Accordingly, the District Court determined that Mr. Alvaran "clearly fits within § 3B1.1 of the guidelines" and that "there is no way that he could be viewed as a minimal or a minor participant in criminal activity under § 3B1.2 of the guidelines."

41

Given that Mr. Alvaran had a criminal history category of 1 and a base offense level of 38, the District Court imposed 3 extra points because Mr. Alvaran served as a manager or supervisor. This brought Mr. Alvaran's total offense level to 41. The Sentencing Guidelines range for this offense level is 324 months to 505 months, and the Probation Office recommended 360 months. The District Court, however, noted that it was not bound by this range, and engaged in an analysis of the § 3553 factors. *See* 18 U.S.C. § 3553(a).

In evaluating the § 3553 factors, the District Court noted that Mr. Alvaran had no prior criminal record, which was "certainly a strong factor on his behalf." Additionally, the District Court recognized Mr. Alvaran's health problems, but explained that his health concerns were not imminently threatening and were not an excuse for criminal conduct. The District Court then proceeded to describe Mr. Alvaran's personal history and characteristics, and weighed this history against the seriousness of the offense and the need for punishment and deterrence. Following this analysis, the District Court imposed a sentence of only 180 months, which was substantially less than Mr. Borda's sentence of 300 months.

## C.

The District Court did not err, much less clearly err, by awarding a below-Guidelines range sentence to Mr. Alvaran for his involvement in the Palm Oil drug conspiracy. When calculating a defendant's base offense level, the District Court must analyze "all relevant conduct." *United States v. Seiler*, 348 F.3d 265, 268 (D.C. Cir. 2003). The term "relevant conduct" refers to "all reasonably foreseeable acts and omissions [committed by] others in furtherance of the jointly undertaken activity." U.S.S.G. § 1B1.3(a)(1)(B); *Seiler*, 348

42

F.3d at 268; *see also United States v. Wyche*, 741 F.3d 1284, 1292-93 (D.C. Cir. 2014). Here, the District Court explained that the scope of the conspiracy was not limited to shipping cocaine from Colombia to Mexico, but rather extended to Junior's transportation of the cocaine to Monterrey and his sale of the cocaine in the United States. The District Court explained that it was reasonably foreseeable to Appellants that Junior would sell cocaine in the United States after he transported it to an inland city near the U.S. border. Mr. Alvaran was aware that Junior would not be able to sell 1,553 kilograms of cocaine in Monterrey given the low demand for drugs in that city, and knew Junior had started sending "partials" to the border by June 15, 2005. Additionally, Mr. Alvaran was aware that Junior's delayed payment for the cocaine was a result of his difficulties at the border. Further, the District Court found Mr. Suarez's testimony credible on the issue that at least 200 kilograms of cocaine had been delivered to New York. Thus, the District Court did not clearly err by establishing Mr. Alvaran's base offense level as 38.

Moreover, the District Court properly applied a three-point enhancement to the base offense level because Mr. Alvaran acted as a manager or supervisor of the drug conspiracy, and the conspiracy involved more than five participants. *See* U.S.S.G. § 3B1.1. Sufficient evidence establishes that Mr. Alvaran participated in planning the Palm Oil transaction from the beginning, and that he supervised numerous aspects of the illegal enterprise, including Mr. Lucas's activities. Mr. Alvaran not only recruited Mr. Suarez, but he also monitored Junior. Mr. Alvaran further organized the transportation of the drug proceeds from Monterrey to Mexico City and safeguarded the money. When the money was distributed, Mr. Alvaran received a return on his investment and provided input on how to allocate Junior's proceeds. Thus, the three-point enhancement was not error.

43

Additionally, the District Court offered a reasoned basis for its decision and did not fail to consider mitigating and non-frivolous arguments for a lower sentence. Where a defendant provides a non-frivolous argument for mitigation, the district court must consider this argument when pronouncing a sentence. *United States v. Bigley*, 786 F.3d 11, 12, 14 (D.C. Cir. 2015) (per curiam). In addition to considering these arguments, the court must provide a "reasoned basis" for its sentencing decision. *United States v. Locke*, 664 F.3d 353, 357 (D.C. Cir. 2011). These standards, however, do not require the court to expressly address every argument advanced by a defendant. *Id.* Rather, "so long as the judge provides a 'reasoned basis for exercising his own legal decisionmaking authority,' we generally presume that he adequately considered the arguments and will uphold the sentence if it is otherwise reasonable." *Id.* at 358 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)). Where the record makes clear that the judge evaluated a defendant's arguments, the presumption of reasonableness will be upheld. *Id.*

In particular, Mr. Alvaran contends that the District Court erred by failing to impose a term of imprisonment that would result in his release by age sixty-five (as the District Court had in Mr. Borda's case). Alvaran Br. 43. This argument is unpersuasive. The District Court adequately considered Mr. Alvaran's personal history and health problems when pronouncing its sentence. The fact that Mr. Alvaran did not have a prior criminal history, combined with his age and health concerns made it unlikely that he would commit additional crimes. The District Court weighed these factors and imposed a sentence of 180 months' imprisonment – well below the Guidelines range of 324 months to 505 months. Moreover, this imprisonment term was almost half of the sentence imposed on Mr. Borda, who received 300 months' imprisonment. The fact that Mr. Alvaran will be older than Mr. Borda upon his release

44

from prison is irrelevant. Thus, the District Court did not err in its sentencing determination.

## D.

While we reject Mr. Alvaran's contentions of error, we nonetheless remand the case to the District Court for resentencing. After Mr. Alvaran was sentenced, the U.S. Sentencing Commission lowered the Guidelines range for certain offenses involving cocaine, and permitted district courts to apply these lower ranges retroactively. *See* U.S.S.G. § 2D1.1; Amendment 782, *supra*; *see also* 18 U.S.C. § 3582(c) (explaining that a district court can modify a term of imprisonment if the applicable Sentencing Guidelines range has been retroactively lowered by the Sentencing Commission). The Government agrees to Mr. Alvaran's request for resentencing on this basis. *See* Gov't Br. 92 n.18 (stating that the Court "should remand" the case to allow Mr. Alvaran to file a motion for a reduced sentence). Thus, the case is remanded to provide Mr. Alvaran with an opportunity to request a reduced sentence.[2] We, of course, express no view on the merits of any such request.

\*\*\*

For the reasons previously discussed, we affirm Appellants' convictions and remand the case to the District Court for resentencing Mr. Alvaran.

*So ordered.*

---

[2] Mr. Borda did not challenge his sentence on appeal. Therefore, our remand is limited to Mr. Alvaran.